**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**DAVID PATTERSON MYERS, M.D.,**

    **Plaintiff,**

v.                                          Case No.  8:06-CV-2347-T-30MAP

**INTERSTATE FIRE & CASUALTY**
**COMPANY and MARKET FINDERS**
**INSURANCE GROUP,**

    **Defendant.**

_____

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court upon cross-motions for summary judgment (Dkts. 17 and 21), the parties' responses thereto (Dkts. 23 and 24), and Defendants' request for oral argument (Dkt. 18). Having considered the motions, relevant case law, and the record evidence, viewed in the light most favorable to the non-moving party, and being otherwise advised in the premises therein, the Court finds that summary judgment in favor of Defendants is appropriate.

**Statement of Facts**

Plaintiff is a medical doctor specializing in addictionology and chronic pain management. Represented by his agent and insurance broker, Sorrell Insurance Company, a retail insurance agency co-owned and operated by David Sorrell ("Sorrell"), Plaintiff initiated a search for a new medical malpractice carrier in 1999.  Based on information gathered from Plaintiff and his staff, Sorrell determined which insurance carrier or carriers best met Plaintiff's needs and assisted him in completing the insurance application. Defendant Interstate Fire & Casualty ("Interstate") was one of the carriers under consideration.

Sorrell submitted the completed application to Market Finders Insurance Group ("Market Finders"), a co-defendant in this litigation and an Interstate managing general agent.[1] Interstate issued a claims-made[2] Physicians and Surgeons Professional Liability Policy of Insurance to Plaintiff under Policy No. DPP 1300146, with effective dates from June 19, 1999, to June 19, 2000, retroactive to June 15, 1989 (the "Policy"). Additional insureds under the Policy were David Patterson Myers, M.D., P.A., HealthCare Connection of Tampa ("HealthCare"), and Biofeedback of Tampa. See Dkt. 19, Ex. G, Change Endorsement dtd. July 2, 2002. The Policy was renewed annually until 2003.

On September 6, 2002, Attorney Michael A. Misa ("Misa") sent a letter to Plaintiff regarding a former patient, William T. Matthews. Misa stated that he had been retained "to represent [Matthews] in a claim for damages arising from [Plaintiff's] negligence on [October 21, 2001]"[3] and

---

[1] As general managing agent representing various insurance carriers, Market Finders works with retail agents of insureds to obtain placement of insurance. Managing general agents generally do not communicate or deal directly with the insureds. Dkt. 19, Ex. C at 19; Ex. D at 29-30.

[2] The application Plaintiff submitted to Interstate cautioned that "[e]xcept to such extent as may be provided otherwise in the policy, the policy for which application is being made is limited to ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED while the policy is in force" (Dkt. 22, Ex. A at 4 (emphasis in original)).

[3] Matthews v. Meyers, Case No. 06-010521 (Fla. 13th Jud. Cir. Ct. 2006) ("Mathews Complaint"). A review of the record reveals that Matthews suffered severe neurological damage and bodily injuries as a result of being struck by lightening while on the job in 1992. During his hospitalization, Matthews became addicted to opiates. Matthews was referred to HealthCare by his pain management doctor to eliminate his opiate addiction, where he became Plaintiff's patient. Plaintiff prescribed a course of medical treatment for the opiate addiction and referred Plaintiff for in-house Narcotics Anonymous sessions administered by Carlton C. McAvey. Matthews was also given a psychosocial assessment by James Payne, another HealthCare employee. Mr. Payne prepared a narrative report indicating that Matthews suffered from legal blindness. In his report, Mr. Payne made reference to a statement by Matthews that he had "one night of infidelity in the course of his marriage" (Dkt. 19, Ex. R at 2-3). The Matthews attended the Narcotics Anonymous group meetings together. When the couple became convinced that they were not deriving any benefit from the group therapy sessions, they elected to withdraw from the program. On or about October 21, 2001, McAvey mailed a letter to Matthews at his home address stating that he had been discharged from the Acute Care Program of HealthCare. Attached to the letter was a copy of Mr. Payne's psychosocial assessment of Matthews referencing, *inter alia*, his marital infidelity. In his complaint, Matthews alleged that when McAvey mailed the discharge letter and psychosocial assessment, he had "actual and constructive knowledge of . . .

(continued...)

requested that he be provided a copy of "any statements, either written or recorded, which purport to have been taken from [Matthews]" and a written statement identifying Plaintiff's liability carrier (Dkt. 22, Ex. D).

In his role as HealthCare's general counsel, Thomas Sweeney contacted Sorrell on September 18, 2002, regarding the Misa letter. Following their telephone conversation, Mr. Sweeney provided Sorrell a copy of the Misa letter by facsimile. According to a November 6, 2003 memorandum written by Sorrell, addressed to Serbrena Friend, Interstate General Medical Malpractice Adjustor, Sorrell forwarded a copy of the Misa letter to Defendant Market Finders on September 22, 2002. Defendant Market Finders has no record of having received the Misa letter.

Interstate stopped writing malpractice insurance, and by letter dated February 25, 2003, informed Plaintiff that his Policy would not be renewed (Dkt. 19, Ex. L). Interstate advised Plaintiff that if he did not purchase replacement coverage from another insurer that included coverage for "prior acts," he should consider purchasing an optional Extended Reporting Period Endorsement ("ERPE"),[4] which would cover claims made during the 12 month period following the Policy's expiration date. Id. Plaintiff had thirty days from the Policy's expiration date to purchase the ERPE. Id. Instead, Plaintiff secured an "occurrence" policy through the Florida Medical Malpractice Joint

---

[3](...continued)
Matthews' blindness, as well as actual knowledge that [ ] Jill Matthews[ ] had to read Matthews' mail to him due to his congenital blindness." Id.

[4]Often referred to as "tail" or discovery period coverage, an Extended Reporting Period Endorsement essentially supplements a "claims made" policy to give the insured added protection. See U.S. Fire Ins. Co. v. Fleekop, 682 So.2d 620 (Fla. 3d DCA 1996); Arad v. Caduceus Self Ins. Fund, Inc., 585 So.2d 1000, 1001 (Fla. 4th DCA 1991) ("[Tail coverage] protects [insureds] into the future for claims regarding incidents that occurred during the policy period but which were not presented until after the policy expired."). The logic of such policies is that an act of malpractice might not be discovered until after the original policy period had terminated, at which time the insured would be completely vulnerable to suit. Tail coverage picks up where the claims-made policy leaves off, with respect to acts committed during the original policy period. Tail coverage does not provide indemnity for new negligent acts or omissions committed during the tail period.

Underwriting Association ("FMMJUA") (Dkt. 19, Ex. C at 50). The FMMJUA policy provided coverage only for incidents alleged to have occurred between July 1, 2003, and July 1, 2004, that subsequently resulted in a claim. Id. at 50.

On October 7, 2003, Matthews' counsel sent Plaintiff a Notice of Intent to Initiate Litigation for Medical Malpractice ("Notice"), supported by affidavits of medical experts. See Fla. Stat. §§ 766.106, 766.202-206.[5] Upon receipt of the Notice, Plaintiff forwarded it to Sorrell, who sent a copy of the Notice to Market Finders as Interstate's managing general agent. Plaintiff asserted that Defendant Interstate had a duty to defend and indemnify him under the terms of his Policy because he provided Market Finders a copy of the Misa letter in September, 2002. On October 31, 2004, Defendant Interstate refused to defend or indemnify Plaintiff, stating in its rejection letter that:

> The claim was reported to Interstate Fire & Casualty on or about October 21, 2003. The Extended Reporting Period shall only be applicable to claims reported in the policy period. In this case, the claim was made on 10-21-03, which is after the expiration of the policy on June 19, 2003. Therefore, there is no coverage available to you for this loss.

Dkt. 19, Ex. N.

On January 20, 2004, Matthews and his wife, Jill Matthews, filed a complaint against Plaintiff and former HealthCare employee Carlton C. McAvey ("McAvey"), in the Thirteenth Judicial Circuit Court, Hillsborough County, Florida (Dkt. 1 at ¶ 13). In their complaint, the Matthews alleged that McAvey, a mental health counselor specializing in substance abuse,

---

[5]The Notice of Intent to Initiate Litigation is a required pre-condition to filing medical malpractice litigation in Florida. Fla. Stat. 766.106, 766.202–206. A lawsuit alleging medical malpractice cannot be filed until at least ninety days after the Notice of Intent to Initiate Litigation is mailed. Fla. Stat. 766.106(3). The ninety day window gives the prospective defendant and the defendant's insurer an opportunity to investigate, and, at the end of the ninety day period, the prospective defendant and/or the defendant's insurer should communicate with the claimant, and advise whether the claim is rejected or whether there is an offer of settlement or arbitration. Fla. Stat. 766.106(3)(b).

committed malpractice by sending a psychosocial report to Matthews' home address stating that he had been unfaithful to his wife. Based on this alleged malpractice, the Matthews sued Plaintiff for breach of fiduciary duty and negligent supervision (Dkt. 19, Ex. R).

Plaintiff's counsel wrote Interstate on February 19, 2004, requesting coverage for the Matthews litigation (Dkt. 19, Ex. S). On May 20, 2004, Interstate again denied coverage based Plaintiff's failure to provide notice of the Matthews claim during the policy period (Dkt. 19, Ex. T). Without admitting liability, Plaintiff settled the Matthews suit for $15,000.00 during the discovery phase of the state proceedings.

Plaintiff filed a three-count Complaint against the Defendants in the Thirteenth Judicial Circuit Court, Hillsborough County, Florida. Seeking reimbursement from Defendants for the money he expended to settle the malpractice suit, plus attorney's fees and costs incident thereto, Plaintiff alleges that Market Finders failed to forward notice of the Matthews claim or otherwise timely advise Interstate of the claim and/or that Interstate wrongfully refused to defend and indemnify Plaintiff from the claim. Defendants removed the case to federal court on December 20, 2006. The jurisdictional basis for removal was diversity of citizenship pursuant to 28 U.S.C. §1332.[6]

---

[6]Plaintiff is a citizen of Florida, with a business address in Hillsborough County, Florida. Interstate is an Illinois corporation, with its principal place of business in Chicago, Illinois, and Market Finders is a Kentucky corporation, with its principal place of business in Louisville, Kentucky.

Defendants support the assertion that the amount in controversy exceeds the jurisdictional limit of $75,000 established by 28 U.S.C. §1332(a), exclusive of interest and costs, by reference to the Plaintiffs's demand for damages and attorneys' fees. According to Defendants, prior to filing suit, counsel for Plaintiff indicated by letter that Plaintiff was entitled to damages of $15,000 paid to settle the underlying litigation that Plaintiff contends Interstate should have defended him against, $30,589.29 for outside attorneys' fees for Plaintiff's defense in that underlying litigation, and $18,000 for Plaintiff's internal attorneys' fees and claims administration, for a total, before any attorneys' fees were incurred in the instant action, of $63,589.29. In his Complaint, Plaintiff is seeking attorneys' fees and costs incident thereto. Defendants contend, and Plaintiff does not dispute, that he will spend more than $12,000 in attorneys' fees in resolving the instant litigation, satisfying the jurisdictional minimum of $75,000. Gibbs v. Buck, 307 U.S. 66, 72 (1939) (unless challenged by the opposing party or the court, a general allegation that the dispute exceeds the jurisdictional minimum is sufficient to support jurisdiction). Moreover, under Florida law, the
(continued...)

Now before the Court are the parties' cross motions for summary judgment. For reasons set forth below, the Court concludes that there is no genuine issue as to any material fact, and the Defendants are entitled to judgement as a matter of law.

## Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion. "The requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action identifies which facts are material. Id. Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in his favor. Id. at 255.

## Legal Analysis

The crux of this dispute is whether Defendant Interstate was required to defend and indemnify Plaintiff in the Matthews litigation. Plaintiff asserts that the Misa letter forwarded by Sweeney to Sorrell served as a timely notice of a claim under the Policy. Defendants assert that they

---

⁶(...continued)
award of attorneys' fees in an insured's action against an insurer, upon rendition of judgment, is statutory, see Fla. Stat. § 627.428(1) (2006) (provides that fees shall be awarded if there is a judgment "against an insurer and in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer"); First Professionals Ins. Co., Inc. v. McKinney, 2007 WL 4372744, at *1 (Fla. 1st DCA 2007) (reversed and remanded on other grounds). See also Morrison v. Allstate Indem. Co., 228 F.3d 1255, (11th Cir. 2000) ("When a statue authorizes the recovery of attorney's fees, a reasonable amount of those fees is included in the amount in controversy"); State Farm Fire & Cas. Co. v. Palma, 629 So.2d 830, 832 (Fla. 1993) (finding that the terms of section § 627.428 - attorney's fees civil liability - are an implicit part of every insurance policy).

did not receive a copy of the Misa letter, and that if, for purposes of argument, the correspondence had been received by either Defendant, or by another entity acting as their agent, that correspondence does not fit the definition of a "claim" within the subject Policy. Defendants further contend that since there was no notice of a claim within the relevant policy period, there was no coverage for the underlying action. Whether Defendants received the Misa letter is a disputed issue of fact. Therefore, for purposes of summary judgment, the Court will only consider Defendants' second contention – that the Misa letter, even if received, did not constitute notice of a claim.

The Court's jurisdiction is based upon diversity, see 28 U.S.C. § 1332, and the case arises under Florida law. In diversity cases arising under Florida law, a federal court is bound by the law articulated by the Florida Supreme Court. See Shapiro v. Associated Int'l Ins. Co., 899 F.2d 1116, 1118 (11th Cir. 1990). If the Florida Supreme Court has not spoken on an issue, Florida District Court of Appeals decisions control absent persuasive indication that the Florida Supreme Court would rule otherwise. See Blanchard v. State Farm Mut. Auto. Ins. Co., 903 F.2d 1398, 1399 (11th Cir. 1990).

Under Florida law, no special rules of construction apply to an unambiguous insurance policy, it is simply interpreted as written. Taurus Holdings, Inc. V. U.S. Fid. And Guar. Co., 913 So.2d 528, 532 (Fla. 2005). Courts must give effect to the plain language of contracts when that language is clear and unambiguous. See Arriaga v. Florida Pacific Farms, L.L.C., 305 F.3d 1228, 1246 (11th Cir. 2002) (citing Hamilton Const. Co. v. Bd. of Pub. Instruction of Dade County, 65 So.2d 729, 731 (Fla. 1953)).

Whether a contract provision is ambiguous is a question for the court. See id. (citing Strama v. Union Fid. Life Ins. Co., 793 So.2d 1129, 1132 (Fla.1st DCA 2001)). The Court uses the plain meaning and ordinary usage of words contained in a contract unless the terms are expressly defined,

and ambiguous terms are construed against the insurer as drafter of the policy. Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000). If the terms of an insurance agreement could reasonably be subject to two interpretations, the interpretation supporting coverage will be used. See State Farm Fire and Cas. Co. V. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla. 1998).

As a "claims-made" policy, the Policy at issue unambiguously limits Interstate's exposure to those claims arising from incidents that occurred on or after the "prior acts" date of the Policy and reported as a "claim" during the policy period and any extended reporting period, if an extended reporting endorsement is purchased by the insured. Gulf Ins. Co. v. Dolan, Fertig and Curtis, 433 So.2d 512 (Fla. 1983). In distinguishing "claims made" policies from "occurrence" policies, the Florida Supreme Court emphasized that "[w]hen an insured becomes aware of any event that could result in liability, then it must give notice to the insurer, and that notice must be given 'within a reasonable time' or as soon as practicable – at all times, however, during the policy period." Id. at 515. Any claim not reported by the end of the policy period is not covered. Id.

In support of his contention that Defendant Interstate's duty to defend was triggered by presentation of the Misa letter to Sorrell on September 18, 2002, Plaintiff invokes the specter of ambiguity, alleging that "there is some ambiguity in the Policy definition of 'claim' that does not easily lend itself to practical application"(Dkt. 23 at 4). In his motion for summary judgment, Plaintiff further asserts that Interstate's position regarding the Misa letter and the Notice is inconsistent in that the Notice, like the Misa letter, does not ask for a "specific amount" of money. Plaintiff argues that "to the extent that Interstate contends that its definition of 'claim' requires that the 'demand for money' must claim a specific amount of money, . . . the policy definition is ambiguous." Dkt. 21 at 5.

First, contrary to Plaintiff's assertions, the policy language on which the instant insurance coverage dispute hinges is clear and unambiguous. The Policy defines "claim" as "a demand for money, or the filing of **Suit** naming the **Named Insured** and alleging a **Bodily Injury** or **Property Damage** as a result of a Medical Incident" (Dkt. 19, Ex. G (emphasis in original)). Under the Policy, a "[s]uit includes lawsuits and arbitration proceedings to which the **Named Insured** is required to submit or to which the **Named Insured** has submitted with the Company's consent." Id. Further, nothing in the policy or the record indicates that Interstate has adopted the position that to be considered valid, a notice of claim must include a demand for a "specific amount" of money.

Plaintiff's attempt to distinguish National Fire Ins. v. Bartolazo from the instant case fails. 27 F.3d 518 (11th Cir. 1994). To the contrary, a comparison of the Misa letter to the letter examined by the Bartolazo court demonstrates that the two documents are very similar in tenor. In Bartolazo, the court considered the legal significance of a letter written by a patient's attorney to the insured doctor in light of the definition of a "claim" in the doctor's malpractice insurance policy. The policy defined a "claim" as "the receipt by you of a demand for money or services, naming you and alleging a medical incident." The body of the letter at issue, stated as follows:

> Dear Dr. Bartolazo, Our office, in association with the office of James H. Turner, represents Helen Marsico in her *claim for medical malpractice* and other relief against you. You are requested to *furnish to us copies of* all your *medical records* pertaining to Helen Marsico within 10 business days of the date of this letter. Authorization for the release of medical information signed by Ms. Marsico is enclosed. We will reimburse you for reasonable copy charges for copies of your records.

Id. at 519. The court ruled that the insurer's contention that the 1990 letter from Marsico's attorney constituted a claim was meritless, finding that "[t]he 1990 letter *made no demand for money* or

services, *nor did it allege a medical incident*. The letter *merely requested* Marsico's *medical records* and *alluded to a claim for malpractice*." Id.

The Misa letter, set forth below, likewise does no more than demonstrate the *possibility* of a claim being filed in the future:

> Please be advised that our firm has been retained to represent the above client in a claim for damages arising from your negligence on the above date.
>
> Please forward me copies of any statements, either written or recorded, which purport to have been taken from my client.  Furthermore, pursuant to Florida Statutes, please provide me within thirty days from the receipt date of this letter, a written statement, under oath, of a corporate officer setting forth the following information, including excess or umbrella insurance:
>
>     (a) The name of the insurer
>     (b) The name of each insured
>     (c) The limits of liability coverage
>     (d) A statement of any policy or coverage defenses which each insurer reasonably believes is available to the insurer filing the statement at the time of the filing of the statement, and
>     (e) A copy of the policy.
>
> Should this insured have coverage with another liability carrier, please provide that companies [sic] name in order to correspond with them.  Thank you for your time and attention.

Dkt. 22, Ex. D.  A demand for insurance information is not the equivalent of a demand for money.  Likewise, Plaintiff's attempt to distinguish the holdings in Aguilar v. Royal Surplus Lines ins. Co., 2006 WL 2038643, (Bankr. S.D. Fla. 2006) and Clarendon National Ins. Co. v. Massari, 2006 WL 3422083 (M.D. Fla. 2006), aff'd., 237 Fed.Appx. 451 (11th Cir. 2007),  fails.

First, in Aguilar, the insured was covered by a "claims made" policy.  An attorney contacted the insured requesting a copy of a former patient's medical records. The insured  sent a letter to the insurer during the policy period that described the attorney's letter as one of 27 incidents that may result in a claim against the insured.  When, nine months after the expiration of the policy, the insured received a notice of intent to initiate litigation from the attorney representing Aguilar, he

notified the insurer of the claim, referring back to the May 22, 2002 letter informing the insurer of a potential claim. Aguilar, supra at *2-3. In response, the insurer denied coverage because the claim was made outside its policy period. Id. The court found that notice of a potential claim was insufficient to trigger the insurer's duty to defend and indemnify. Id. at *8-9The Aguilar court further differentiated between a letter that is nothing more than a "preparatory act to the possibility of making a claim, depending on what the medical records showed" and a letter which advises the insured "to put its carrier on notice." Id. at n4 *12.

Likewise, Massari notified his insurer of a potential or possible claim during the extended reporting period, but did not notify the insurer of the actual claim until the extended report period expired. The Massari court held that "the lack of an actual claim during the policy period precludes coverage for [the] malpractice action against Massari." Clarendon National Ins. Co. v. Massari, 2006 WL 3422083 at *4.

Finally, Plaintiff's reliance on the holding in Paradigm Inc. V. P & C Ins. Systems, 747 So.2d 1040 (Fla. 3d DCA 2000) in support of his position that presentation of the Misa letter to Market Finders constituted notice of a claim under the Policy is similarly misplaced. In Paradigm, a judgment holder's attorney sent a letter to the insurer's agents advising that they had negligently failed to procure insurance coverage for the insured and that a loss had occurred (an adverse judgment). The judgment holder later filed suit against the insurance agents, reiterating the same claim of negligence. When contacted, the insurer contended that there was no coverage under the insureds' claims-made policy because the relevant claim of negligence was not made until after the policy expired. The Paradigm court rejected the insurer's contention that a letter written by a judgment creditor's attorney to the insured did not meet the policy definition of a "claim," holding:

> We think a statement of a claim of negligence and resulting loss (in this case, a claimed failure of an insurance agency to procure liability

>  insurance), followed by *a request "to turn this letter over to your errors and omissions insurance carrier for handling"* amounts to a demand for money within the meaning of Paradigm's policy.

Id. at 1041 (citations omitted) (emphasis added).

The Court considers this a close case because Misa's letter advised that he had been retained as to "a claim for damages." But this language does not rise to the Policy's definition of a "claim." The Misa letter makes no demand for money, nor does it advise Plaintiff to forward the letter to his insurance carrier. As in Aguilar, when taken in context, Misa's statement that he was retained to represent Matthews in "a claim for damages" was merely a notice of a potential claim, insufficient to trigger the insurer's duty to defend and indemnify. 2006 WL 2038643, at *8-9.

As both parties recognize, the pivotal issue presented by this case is whether Plaintiff was entitled to coverage in regard to the Matthews Complaint. Based on the plain language of the Policy, the Court finds that Defendant Interstate properly declined coverage in the Matthews litigation, and summary judgment should be granted in favor of Defendants. Since this issue is dispositive, it is not necessary to address other issues raised in the parties' motions or entertain oral argument.

It is therefore **ORDERED AND ADJUDGED** that:

1. Plaintiffs' Motion for Summary Judgment (Dkt. #21) is **DENIED**.

2. Defendant's Motion for Summary Judgment (Dkt. #17) is **GRANTED**.

3. The **Clerk** is directed to enter summary final judgment in favor of Defendants, terminate all pending motions as moot, and close this case.

**DONE and ORDERED in Tampa, Florida on January 30, 2008.**

*/s/ James S. Moody, Jr.*
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record
S:\Odd\2006\06-cv-2347.msj-1.wpd